**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 15 |
| | § | |
| **FOSSIL (UK) GLOBAL** | § | Case No. 25-90525 (___) |
| **SERVICES LTD,**[1] | § | |
| | § | |
| Debtor in a Foreign Proceeding. | § | |
| | § | |

**DECLARATION OF FOREIGN REPRESENTATIVE**
**PURSUANT TO 11 U.S.C. § 1515 AND RULE 1007(a)(4) OF**
**THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND IN**
**SUPPORT OF VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN**
**MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,**
**AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

I, Randy Greben, to the best of my information and belief, state as follows:

1.      I am over the age of 18 and, if called upon, could testify to all matters set forth in this declaration based upon my own personal knowledge except for those portions specified as being otherwise.  I am making this declaration in accordance with section 1515 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

2.      I am the Chief Financial Officer of the above-captioned debtor (the "**Foreign Debtor**").  In such capacity, I am familiar with the Foreign Debtor's and the Company Group's (as defined below) business, day-to-day operations, and financial affairs.  I am also the foreign representative (the "**Foreign Representative**") of the Foreign Debtor and authorized to commence this chapter 15 case.

---

[1]      The last four digits of Foreign Debtor's foreign identification number are: 7372.  The location of the Foreign Debtor's service address for purposes of this chapter 15 case is: Ashton House, 497 Silbury Boulevard, Milton Keynes, United Kingdom, MK9 2LD.  Additional information may be obtained on the website of the Foreign Debtor's information agent at http://dm.epiq11.com/fossiluk.

3.       I submit this declaration in support of:  (a) the official form chapter 15 petition for the Foreign Debtor (the "**Form Petition**"); and (b) the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "**Verified Petition**")[2], both filed contemporaneously with this declaration.

## I.       The Company Group's Business

4.       The Foreign Debtor, a private limited company incorporated under the laws of England and Wales, together with its non-Debtor affiliates and direct and indirect parent companies (collectively, the "**Company Group**"), operate a leading design, innovation, and distribution company specializing in consumer fashion accessories. The Company Group's products include watches, jewelry, handbags, small leather goods, belts and sunglasses. The Company Group designs, develops, markets and distributes its products under various world-class owned brands, including Fossil, Skagen, Relic, and Zodiac, and licensed brands.  As of July 2025, the Company Group operates 214 stores worldwide, and employs over 4,500 employees.  The Company Group's products are sold across approximately 130 countries worldwide through various distribution channels, including wholesale, direct-to-consumer through retail stores and e-commerce, and through third-party distributors.  In certain international markets, the Company Group's products are also sold online and through licensed and franchised FOSSIL retail stores, retail concessions operated by the Company Group and kiosks.  The Company Group offers online and in-store experiences in the United States, Europe and Asia.

5.       The Company Group operates in the UK through Fossil (UK) Holdings Limited and Fossil (UK) Limited.  The Foreign Debtor is a wholly owned subsidiary of Fossil (UK)

---

[2]       Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Verified Petition.

Limited.  The Company Group's UK sales are generated through wholesaler distributors and direct to consumer sales.  In particular, the Company Group currently operates two (2) full price stores and nine (9) outlet stores in the UK and facilitates sales in the UK through its own websites.

## II.    Corporate and Capital Structure

6.    The Company Group is comprised of sixty-five (65) legal entities organized under the laws of various jurisdictions, including the United States, United Kingdom, Austria, Belgium, British Virgin Islands, Canada, China, Denmark, France, Germany, Gibraltar, Hong Kong, India, Italy, Japan, Korea, Luxembourg, Malaysia, Mexico, Netherlands, New Zealand, Norway, Poland, Portugal, Singapore, South Africa, Spain, Sweden, Switzerland, and Vietnam.  Equity in the ultimate parent of the Company Group, Fossil Group Inc. ("**FGI**"), has been publicly traded on the NASDAQ exchange under the ticker symbol "FOSL" since 1993.

7.    FGI is governed by a board of directors (the "**Board**") consisting of nine members. The operations of the Company Group are managed from FGI's headquarters in Richardson, Texas.

8.    The Foreign Debtor in this chapter 15 case is Fossil (UK) Global Services Ltd, a subsidiary of the Fossil U.K. Ltd. incorporated under the laws of the United Kingdom, and a guarantor on the Unsecured Notes (as defined below). The Foreign Debtor's headquarters are located at Ashton House, 497 Silbury Boulevard, Milton Keynes, England, MK9 2LD.

9.    A structure chart depicting the Company Group's organizational structure is attached hereto as **Exhibit A**.

10.    As of the date hereof, members of the Company Group are party (either as borrower, issuer, or guarantor) to a principal amount of prepetition funded indebtedness totaling approximately $300 million in U.S. dollar denominated debt as set forth and described in greater detail below.

| Funded Debt | Total Availability / Principal Outstanding | Maturity Date |
|---|---|---|
| ABL Credit Facility | $150,000,000 | August 13, 2030 |
| Unsecured Notes | $150,000,000 | November 30, 2026 |
| **Total:** | **$300,000,000** | |

### A.    ABL Credit Facility

11.    Certain members of the Company Group are party to that certain Credit Agreement, dated as of August 13, 2025, among FGI, Fossil Partners, L.P., the U.S Subsidiary Borrowers party thereto (together with FGI and Fossil Partners, L.P., the "**U.S. Borrowers**"), Fossil Canada Inc. (together with the U.S. Borrowers and any other Subsidiary designated as a Borrower pursuant to the ABL Credit Agreement (as defined below), the "**Borrowers**"), certain other subsidiaries of FGI as Guarantors from time to time party thereto, ACF FinCo I, LP, as Administrative Agent, and the Lenders from time to time party thereto (as amended from time to time and with all supplements and exhibits thereto, the "**ABL Credit Agreement**").  The ABL Credit Agreement provides for a $150 million asset-based revolving credit facility (the "**ABL Credit Facility**").  The ABL Credit  Facility was put in place by the Company Group in August 2025 in connection with the Refinancing Transaction (as defined below), specifically to refinance the Company Group's prior $225 million asset-based revolving credit facility with JPMorgan Chase Bank, N.A. as administrative agent, which was due to mature on November 7, 2027 (the "**JPM ABL Facility**"). The ABL Credit Facility is due to mature on August 13, 2030. The Foreign Debtor is not party to the ABL Credit Agreement.

### B.    Unsecured Notes

12.    The Foreign Debtor is a guarantor under that certain Indenture, dated as of November 8, 2021, as supplemented by (i) a First Supplemental Indenture dated November 8,

2021, (ii) a Second Supplemental Indenture dated September 19, 2025 (the "**Second Supplemental Indenture**"), in each case, between FGI as borrower (the "**Issuer**"), the Foreign Debtor, and The Bank of New York Mellon, N.A., as trustee (the "**Notes Trustee**"), (as amended, restated, amended and restated, further supplemented, or otherwise modified from time to time, the "**Unsecured Notes Indenture**"). The Unsecured Notes Indenture governs the 7.00% senior unsecured notes due 2026 in the aggregate principal amount of $150 million (the "**Unsecured Notes**" and the holders or beneficial owners of such notes from time to time, the "**Noteholders**"). The Unsecured Notes do not benefit from any security provided by the Foreign Debtor or FGI.

### III.    Events Leading to the Refinancing Transaction

#### A.    Challenging Retail Environment

13.    The retail sector in which the Company Group operates has been an extremely challenging environment in recent years, negatively impacting performance. Over the last decade, the global watch and accessories market has suffered significant disruption following major competitors (such as Apple and Samsung) and direct-to-consumer enterprises capturing significant market share. This disruption followed the wake of evolving consumer preferences reflected by the increased prevalence of smartphones and the burgeoning growth of wearable technology. Pressures such as these have caused the Company Group's business to experience slower than expected consumer demand for its products.

14.    In 2022, the business generated approximately $1.7 billion in sales and realized a net loss of approximately $44 million. By 2024, as a result of these challenges, sales had declined to $1.1 billion and net loss expanded to approximately $106 million. Further, during that time, the business used more than $100 million in cash from operating activities.

#### B.    Turnaround Plan

15.    To address these challenges, in early 2023, the Company Group announced that it

would undertake a strategic review of its business model and capital structure. This review included a broader set of efforts to optimize the Company Group's business model and further reduce structural costs, monetize various assets, and pursue potential refinancing options.  To facilitate this strategic review, in July 2024, the Board formed the Strategic Planning and Finance Committee.  In September 2024, FGI appointed Franco Fogliato as Chief Executive Officer and a member of the Board of Directors, and moved quickly to implement changes and create a plan to return the Company Group to profitable growth (the "**Turnaround Plan**").

16.    The Turnaround Plan is centered on three key initiatives: (i) refocusing on the Company's core businesses, (ii) rightsizing cost structure, and (iii) strengthening the balance sheet. The implementation of the Turnaround Plan to date has generally been positive for the Company Group's business and trading performance.  For example, in 2025, the Company expects to achieve selling, general and administrative cost savings of approximately $100 million as compared to fiscal year 2024 through a series of initiatives including a strategic reduction in force (which occurred in late February 2025), reduced costs associated with the transition of smaller international markets to a distributor model, and the closing of underperforming retail stores. Further, as a result of execution on the Turnaround Plan, the Company Group achieved gross margins above 50% for fiscal year 2024 and just below 60% for the first half of 2025.

17.    In August 2024, the Company engaged the international investment bank and advisory firm, Evercore Group LLC ("**Evercore**"), to assist in pursuing the Turnaround Plan initiatives.  Under the third prong of the Turnaround Plan, strengthening the Company Group's balance sheet, the Company began actively pursuing initiatives to monetize non-core assets, improve working capital, and beginning in early 2025, commencing discussions with its stakeholders and third-party capital providers regarding potential refinancing opportunities.

18.     In December 2024, the Company Group began exploring the potential sale of three (3) specific non-core brands to be disposed of collectively or separately. Evercore approached twenty-seven (27) institutions, comprised of a range of strategic parties in the watch/jewelry space, brand aggregators/licensors and other financial investors. Although nine (9) parties received the long-form brand marketing materials following the initial outreach by Evercore, only five (5) parties submitted first round bids. Although an offer for one (1) brand was agreed, as of the date hereof, that proposed transaction is not moving forward due to concerns relating to international tariff regimes and increased production costs.

C.     **Impact of US Tariff Policy**

19.     During the early stages of the Company Group's marketing process for a potential refinancing, changes to U.S. tariff policy and the resulting uncertainty in the markets negatively impacted the Company Group's business and its efforts to implement a strategic refinancing transaction on its target timeline.  Most of the Company Group's products are assembled or manufactured overseas, with the substantial majority of those products imported from China.  In early 2025, the U.S. presidential administration announced significant new tariffs on foreign imports into the United States, including from China.  In April 2025, the U.S. government announced additional tariffs on various goods imported into the U.S., which was followed by several months of rapid changes in U.S. trade policies including further sweeping tariff increases, as well as retaliatory tariffs by foreign countries.  Overall, incremental tariffs negatively impacted the Company Group's gross margin by approximately 80 basis points for Q2 2025.  The Company Group and its advisors continue to develop and implement mitigation strategies such as price increases and sourcing changes among others, and determining future implementation timelines.

IV.     **TSA and Refinancing Transaction**

20.     As noted above, the Company Group's approaching debt maturities, together with

the challenging retail market environment, caused the Company Group to engage legal and financial advisers to review its options with respect to its balance sheet. The immediate objective of the Company Group was to refinance its existing funded indebtedness, comprised of the JPM ABL Facility and the Unsecured Notes, to raise incremental liquidity that would allow the Company Group to achieve its business plan, extend the maturities on its debt, and drive long-term profitability. Specifically, the approaching November 2026 maturity on the Unsecured Notes put FGI at risk of having to make a "going concern" disclosure with respect to its third quarter 2025 financial reports to be issued on November 13, 2025.

21. In early 2025, the Company Group and its advisors commenced negotiations with its key stakeholders regarding the terms of a refinancing transaction. These negotiations culminated in an agreement on the key terms of the Refinancing Transaction (defined below) and the execution of a TSA (together with all exhibits and schedules attached thereto, the "**TSA**"), dated as of August 13, 2025, between FGI and certain of its subsidiaries, including the Foreign Debtor, and Noteholders representing approximately (at the time) 59% of the outstanding principal amount of Unsecured Notes (the "**Consenting Noteholders**"), in support of the Refinancing Transaction. As part of the TSA, the Consenting Noteholders agreed to, among other things, support the Refinancing Transaction, including, to the extent necessary, a restructuring plan pursuant to Part 26A of the Companies Act 2006 of England and Wales (the "**Restructuring Plan**").

22. The comprehensive refinancing transaction contemplated under the TSA (the "**Refinancing Transaction**") is comprised of three key components: (a) entry into the ABL Credit Facility to refinance the JPM ABL Facility, as described *supra* ¶ 7; (b) implementation of a restructuring of the Unsecured Notes (the "**Notes Restructuring**") and the provision of New

Money Financing via the Exchange Transactions (each as defined below); and (c) if needed, implementation of the Notes Restructuring and the provision of the New Money Financing pursuant to the Restructuring Plan.  The Foreign Debtor is only seeking recognition of the Restructuring Plan pursuant to this chapter 15 case at this time.

23.     In the first instance, the TSA contemplates implementing the exchange of Unsecured Notes by means of an out-of-court private exchange and exchange offer registered with the U.S. Securities and Exchange Commission ("**SEC**").  The Exchange Transactions (as defined below) were to be implemented on an out-of-court basis, without the need for a Restructuring Plan, if Noteholders holding at least 90% (or such lower threshold as agreed to between the parties to the TSA and the ABL Credit Facility) of the outstanding principal amount of Unsecured Notes (the "**Out-of-Court Threshold**") validly tendered their Unsecured Notes in connection with the Exchange Offer prior to the exchange deadline (the "**Exchange Deadline**"), initially set for October 7, 2025, and subsequently extended in accordance with the TSA to October 22, 2025.  If, as of the date of the Exchange Deadline, the Out-of-Court Threshold was not satisfied or waived, the TSA provides for implementation of the Notes Restructuring through the Restructuring Plan.

24.     The critical first step of the Refinancing Transaction was achieved concurrently with execution of the TSA on August 13, 2025, when the Company Group successfully refinanced its $225 million revolving asset-based lending facility with the existing ABL Credit Facility.  The new ABL Credit Facility was entered into to support the Company Group's immediate short-term liquidity needs by providing additional funding necessary to navigate a period of tight liquidity in September 2025 and thus enable the Company Group to pursue its broader refinancing objectives. With this milestone achieved, the Company Group and its advisors quickly pivoted to launching the Exchange Transactions on the terms set forth in the TSA.

### D.   Exchange Transactions

25.    As part of the Refinancing Transaction, the Company Group is undertaking a balance sheet restructuring pursuant to the terms of the TSA, which contemplates the exchange of its existing Unsecured Notes for new (i) 9.500% First-Out First Lien Secured Senior Notes due 2029 in a maximum aggregate principal amount of up to $185,125,000 (the "**First-Out Notes**"), and (ii) 7.500% Second-Out Second Lien Secured Senior Notes due 2029 in a maximum aggregate principal amount of up to $58,457,360 (the "**Second-Out Notes**" and, together with the First-Out Notes, the "**New Notes**").   In the first instance, the TSA contemplates implementation of that exchange through the following transactions (the "**Exchange Transactions**"):

a.    With respect to the Consenting Noteholders, (i) to participate for their *pro rata* portion of the New Money Financing (as defined below) offered on a private placement basis (the "**Backstop Commitment**"), and (ii) an out-of-court private exchange of Unsecured Notes in which the Consenting Noteholders will acquire First-Out Notes and warrants ("**Warrants**") to purchase (A) Common Stock or (B) pre-funded warrants ("**Pre-Funded Warrants**");

b.    With respect to all other Noteholders, an SEC-registered offer in which FGI offers such Noteholders the opportunity (i) to participate for their *pro rata* portion of the New Money Financing and receive the New Money Premium (the "**Rights Offering**"), and (ii) to tender their Unsecured Notes in exchange for (x) if such Noteholder funds the full amount of its *pro rata* portion of the New Money Financing, First-Out Notes, and (y) if such Noteholder does not fund the full amount of its *pro rata* portion of the New Money Financing, the Second-Out Notes, in each case, their respective portion of Warrants (the "**Exchange Offer**").

26.    In connection with the Rights Offering, all Noteholders were offered the opportunity (the "**New Money Offering**") to purchase on a *pro rata* basis (based on the face amount of their respective Unsecured Notes in comparison to the total aggregate principal amount of all Unsecured Notes) up to $32.5 million in face amount of First-Out Notes (the "**New Money Financing**" and such participating Noteholders' commitments to provide the New Money Financing, the "**New Money Commitment**").   Noteholders that choose to subscribe for and

purchase their *pro rata* portion of First-Out Notes as part of the New Money Offering (each such Noteholder, a "**New Money Participant**") will be entitled to exchange their Unsecured Notes for First-Out Notes as part of the Restructuring Plan.  New Money Participants will also receive a premium, at no additional cost, paid in common stock of FGI ("**Common Stock**") in an amount equal to one share of Common Stock for every $34.06 of First-Out Notes subscribed for or purchased (the "**New Money Premium**").

27.     Under the TSA, the New Money Financing is fully backstopped (the "**Backstop Commitment**") by the Consenting Noteholders (the "**Backstop Providers**").  As consideration for the Backstop Commitment, FGI will pay the Backstop Providers a backstop premium (the "**Backstop Premium**") of $1.625 million principal amount of First-Out Notes.

28.     The TSA further contemplates that FGI will solicit consent of the Noteholders to effectuate the Governing Law Change (defined below) through a public consent solicitation (the "**Consent Solicitation**").  Noteholders consenting into entry of a supplemental indenture to the Notes Indenture (the "**Restructuring Plan Supplemental Indenture**") to implement the Governing Law Change are entitled to receive a consent premium (the "**Consent Premium**") comprised of an aggregate amount $1.0 million in face amount of New Notes, paid on a *pro rata* basis based on such Noteholder's Unsecured Notes validly tendered in the Exchange Transaction.

29.     FGI launched the Exchange Offer and Consent Solicitation on September 9, 2025. As of the initial Exchange Deadline of October 7, 2025, holders of approximately 72% of the outstanding principal amount of the Unsecured Notes validly tendered in support of the Exchange Transaction, and so, in accordance with the TSA, the Foreign Debtor proceeded to implement the Notes Restructuring through the Restructuring Plan.  At the same time, the Exchange Deadline was extended to allow additional tenders to be made.  In light of the extended Exchange Deadline,

the Company continues to solicit tenders for the Exchange Transaction, and currently holders of approximately 75% of the outstanding principal amount of the Unsecured Notes have tendered in the Exchange Transaction.

**E.    Restructuring Plan**

30.    The Company Group is seeking to effectuate the Restructuring Plan pursuant to Part 26A of the Companies Act 2006, a restructuring procedure which came into effect on June 26, 2020.  The Restructuring Plan provides for the treatment of the Unsecured Notes only. The objective of the Restructuring Plan is to put the Foreign Debtor and the Company Group on stable financial footing so that it can continue to implement a business plan and return to profitable growth.  The Restructuring Plan achieves this objective by: (i) releasing the Unsecured Notes as against FGI and the Foreign Debtor and providing each Noteholder with the option of subscribing for either the First-Out Notes or Second-Out Notes; and (ii) facilitating provision of the New Money Financing.  Holders of the Unsecured Notes comprise a single class for purposes of voting on the Restructuring Plan.

31.    To promote the overall restructuring of the Company Group as part of the Turnaround Plan, the TSA provides that, as a preliminary step to launching the Restructuring Plan, the Foreign Debtor would accede as a guarantor under the terms of the Unsecured Notes through entry into the Second Supplemental Indenture with the Notes Trustee.  Further, the TSA provides that the governing law and jurisdiction clauses of the Unsecured Notes would be amended to change the governing law of the Unsecured Notes from New York law to English law (the "**Governing Law Change**") and to submit to the exclusive jurisdiction of the courts of England and Wales.

32.    In addition, the Foreign Debtor has also entered into a deed of contribution on September 21, 2025 pursuant to which the Foreign Debtor has undertaken, in favor of FGI, to

contribute to any amounts that are paid by FGI towards the obligations under the Unsecured Notes (the "**Deed of Contribution**"). The Deed of Contribution will result in FGI having rights of contribution against the Foreign Debtor. As a result, the Foreign Debtor would not be able to effectively obtain a release or variation of the rights of the Noteholders against it in respect of the Unsecured Notes without also releasing or varying the Noteholders' rights against FGI.

33.     The key terms of Restructuring Plan are set forth below:

| Key Terms of Restructuring Plan[3] | |
|---|---|
| **Overview** | The Restructuring Plan will provide for the following: <ul><li>the provision to the Company Group of the $32.5 million of New Money Financing;</li><li>the granting of guarantees and security in favor of the New Notes;</li><li>the issuance of the "Plan Consideration" comprised of the New Notes, the Warrants and the Common Stock, as applicable, to the Noteholders and the cancellation of the Unsecured Notes;</li><li>the provision of the New Money Premium to Noteholders participating in the New Money Financing;</li><li>the provision of the Backstop Premium to the Backstop Providers;</li><li>the execution of a deed of release (the "**Deed of Release**") that will confirm the releases effected under the Restructuring Plan as against, amongst others, the Foreign Debtor and FGI arising out of or in connection with, among other things, the preparation, negotiation, and execution or implementation of the TSA, the Restructuring Plan, and the documents relating to the Restructuring Plan;</li><li>a grant of authority for the Foreign Debtor, FGI and the relevant parties to execute the documents required to implement the</li></ul> |

---

[3]    The following is only a summary of key terms of the Restructuring Plan, is provided for illustrative purposes only, and is qualified in its entirety by reference to the full text of the Restructuring Plan. In the event of any inconsistency between this summary table and the Restructuring Plan, the Restructuring Plan or the relevant underlying implementation documentation will control in all respects.

| | |
|---|---|
| | foregoing and the Refinancing Transaction on behalf of the Noteholders (the "**Implementation Documents**"); and[4] <br><br> • payment of the reasonable and documented costs, fees and expenses of the Consenting Noteholders' legal advisors in connection with the negotiation and implementation of the Notes Restructuring. |
| **Restructuring Steps** | The Transaction Implementation Deed will govern the implementation of the Notes Restructuring. The following "Restructuring Steps" set out in the Transaction Implementation Deed shall occur in the order described below and as set forth in more detail in the Transaction Implementation Deed: <br><br> • New Money Commitments are released in DTC; <br><br> • Unsecured Notes are cancelled pursuant to the terms of a "Cancellation Order" delivered to the Notes Trustee and New Notes, Warrants, and Common Stock are issued; <br><br> • New Notes collateral and security agreements and intercreditor agreement are executed and become effective in accordance with their terms; <br><br> • Transaction costs, expenses and advisor fees are paid; and <br><br> • The Foreign Debtor shall date, deliver, and release the Deed of Release. <br><br> The Restructuring Effective Date shall occur immediately upon the completion of the last Restructuring Step. |

---

[4]   Following the Convening Hearing (as defined below), final drafts of the Implementation Documents were made available for review by the Noteholders through the website (https://dm.epiq11.com/fossil) maintained by the Debtor's information agent, Epiq Corporate Restructuring, LLC ("**Epiq**") and are available via EDGAR on the SEC website at www.sec.gov.

| | |
|---|---|
| **Conditions Precedent to the Restructuring** | Under the provisions of Part 26A of the Companies Act, for the Restructuring Plan to become effective it must be approved by a number representing at least 75% in value of the creditors present and voting (in person or by proxy) at the meeting convened to consider the Restructuring Plan.

Even if the Noteholders approve the Restructuring Plan by the requisite majorities and the Restructuring Plan is sanctioned by High Court of Justice of England and Wales (the "**English Court**"), the Restructuring Plan will only be implemented if and when each of the conditions precedent are satisfied or waived, including (but not limited to) the following:

- a certificated copy of the order of the English Court sanctioning the Restructuring Plan being filed with the Registrar of Companies for England and Wales;

- all relevant regulatory approvals, which the Foreign Debtor determines in its sole discretion are required for the Foreign Debtor to implement the Restructuring Plan, being obtained (or otherwise waived);

- no defaults or events of defaults having occurred and/or be continuing under the ABL Credit Facility;

- the provision to the Company Group of the New Money Financing;

- the issuance of the Warrants;

- the Company Group obtaining consents from certain licensors to waive any defaults or events of default arising as a result of the UK Proceeding; and

- the approval of the Consent Solicitation to effect the Governing Law Change. |
| **Releases** | The Deed of Release provides for certain releases of claims and liabilities as between the Released Parties in connection with the Restructuring Plan and the broader Notes Restructuring. The Deed of Release will become effective, and the releases within it operational, on and from, and subject to the occurrence of, the effective date of the Restructuring Plan (the "**Restructuring Effective Date**").

- **Released Parties**: (i) the Foreign Debtor; (ii) FGI; (iii) certain members of the Company Group listed in Schedule 3 to the Deed of Release (collectively, the "**Group Companies**"); (iv) the Plan Creditors and their affiliates; (v) Epiq, as Information Agent to the Foreign Debtor; (vi) Cantor Fitzgerald |

& Co, as dealer manager to FGI (the "**Dealer Manager**"); (vii) the Notes Trustee; (viii) DTC; (ix) Cede & Co.; (x) the professionals, including any local or specialist counsel, retained by the Foreign Debtor and Consenting Noteholders, and their respective directors, officers, members, representatives, partners, employees, agents, affiliated partnerships (and the partners and employees of such affiliated partnerships), affiliates, subsidiaries or holding companies (and the directors, officers, members, representatives, employees and agents of those affiliates, subsidiaries or holding companies); (xi) Cravath, Swaine & Moore LLP, as counsel to the Dealer Manager; and (xii) the Retail Advocate.

- **Releasing Parties**: (i) the Foreign Debtor; (ii) FGI; (iii) certain Group Companies; and (iv) the Plan Creditors.

Under the Deed of Release, each of the Releasing Parties, without recourse, liability, representation or warranty, irrevocably, unconditionally, fully and absolutely, to the fullest extent permitted by law, waives, releases and discharges all liabilities of each Released Party and every claim that each Releasing Party may have against any Released Party arising out of or in connection with any act or omission by any Released Party occurring prior to the Restructuring Effective Date relating to the preparation, negotiation, sanction, execution or implementation of: (i) the TSA; (ii) the Restructuring Plan; (iii) the Restructuring Steps; (iv) the Restructuring Documents;[5] and/or (v) the Notes Restructuring.

34.     Following consummation of the Restructuring Plan, no Unsecured Notes will remain outstanding.   The relative priorities of the Company Group's go-forward funded indebtedness, comprised of the ABL Credit Facility, First-Out Notes, and Second-Out Notes are set forth below:

a.     ABL Credit Facility will remain in place with a first priority security interest in, among other things, (i) credit card receivables, payment intangibles, and accounts, (ii) cash and cash equivalents, (iii) inventory, (iv) intercompany indebtedness, and (v) proceeds of the loans made under the ABL Credit Facility (collectively, the "**ABL Priority Collateral**"));

---

[5]     "Restructuring Documents" are comprised of: (i) the Restructuring Plan; (ii) the Transaction Implementation Deed; (iii) the Deed of Release; (iv) the indentures for the New Notes; and (v) any other deeds, documents, agreements and instruments referred to, contemplated by or ancillary to any of the foregoing and that are required to give effect to the Notes Restructuring.

b.  First-Out Notes will rank first priority in all collateral other than the ABL Priority Collateral ("**Notes Priority Collateral**");

c.  Second-Out notes will rank second priority in the Notes Priority Collateral.

35.  Under the likely alternative to the Restructuring Plan, and thus the "relevant alternative" for the purposes of Part 26A of the Companies Act, the Company Group would face immediate adverse consequences including, among others, the likely adverse impact of a "going concern" disclosure in connection with FGI's third quarter 2025 10-Q filing to be issued on November 13, 2025, difficulty maintaining business, licensing, financing and operational relationships, and a reduced interest in the Company Group from investors, finance providers and potential purchasers.  In such circumstances, the Company Group would need to pursue alternative near-term restructuring transactions, including potential asset sales delivered through commencement of voluntary cases under Chapter 11 of Title 11 of the United States Code, to address its capital structure and liquidity needs.  Further, failure to consummate the Restructuring Plan by December 30, 2025 in accordance with the Exchange Milestones set forth in Section 5.31 the ABL Credit Agreement, will trigger an Event of Default under the ABL Credit Facility, unless the Exchange Milestones are extended or waived.  In the event that FGI is unable to negotiate a waiver, the occurrence of such an event of default will allow the lenders under the ABL Credit Facility to terminate the commitments thereunder, accelerate any outstanding obligations at that time and draw stop the ABL Credit Facility, therefore materially impairing the Company Group's access to necessary liquidity.

36.  If the Restructuring Plan is not sanctioned, the most likely scenario would be for: (i) FGI to enter Chapter 11 in the US with the aim of effecting a 363 Sale of the business; and (ii) the Foreign Debtor to be wound up.

### F.        UK Proceeding

37.        Given the substantial number of "retail holders" of Unsecured Notes, on September 17, 2025, the Foreign Debtor appointed Mr. Jon Yorke to act as an independent representative (the "**Retail Advocate**") of the Noteholders who are not professional or institutional investors and hold the Unsecured Notes for their own personal account. His role is to engage with Noteholders who are "retail holders" and consider their views on the Restructuring Plan and present those views to the English Court at both the Convening Hearing and the Sanction Hearing.

38.        Pursuant to Part 26A of the Companies Act, on September 23, 2025, the Foreign Debtor sent to Noteholders entitled to vote on the Restructuring Plan a letter notifying them of the Restructuring Plan and its intention to seek an order to convene a single meeting of the Noteholders, at a hearing on October 15, 2025 before the English Court (the "**Convening Hearing**").  At the Convening Hearing, Mr. Justice Cawson considered the proposed Restructuring Plan, including the composition of the stakeholders entitled to vote on the plan, and by order dated October 15, 2025 (the "**Convening Order**") in the UK Proceeding, granted leave to the Foreign Debtor to convene the requested meeting of Noteholders on November 6, 2025 (the "**Plan Meeting**") to vote on the Restructuring Plan.  The Noteholders received notice of the Explanatory Statement in connection with the Restructuring Plan on October 15, 2025, which Explanatory Statement included specific reference to the Foreign Debtor's intent to commence this chapter 15 case to seek recognition of the UK Proceeding. *See* Sage Decl., Ex. C., § 47.2.  The Foreign Debtor and the Foreign Representative thereafter commenced this chapter 15 case.

## VI.    Appointment as Foreign Representative and Filing of the Verified Petition

39.        On October 7, 2025, the Foreign Debtor's board of directors appointed me as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code for purposes of the UK Proceeding.  Concurrently, I was authorized to file the Verified Petition seeking recognition

of the UK Proceeding as a foreign main proceeding.  The Convening Order separately recognized and declared that I have been validly appointed as "foreign representative" for purposes of this chapter 15 case as well.

40.     It is my understanding that for these reasons, I satisfy the definition of a "foreign representative" as that term is defined in section 101(24) of the Bankruptcy Code.

41.     The Foreign Debtor has property in the United States in the form of a $50,000 retainer held in an account maintained in Houston, Texas by Weil, Gotshal & Manges LLP, counsel to the Foreign Representative and to the Foreign Debtor, which amounts are not to be applied as retainer against the provision of legal services unless and until the Foreign Debtor ceases to make fee payments to Weil in the ordinary course, and otherwise are to be returned to the Foreign Debtor.

42.     I filed the Verified Petition pursuant to sections 1504 and 1515 of the Bankruptcy Code commencing this chapter 15 case in the Southern District of Texas, seeking recognition of the UK Proceeding as a "foreign main proceeding," and seeking other necessary or appropriate relief in support of the UK Proceeding.

43.     I have been informed that the UK Proceeding is a "foreign proceeding" as it is a collective judicial proceeding authorized and supervised by the English Court under Part 26A of the Companies Act.  It is my understanding that for these reasons, the UK Proceeding qualifies as a "foreign proceeding" as that term is defined in section 101(23) of the Bankruptcy Code.

44.     I have been informed that the Bankruptcy Code provides for recognition of a foreign proceeding as a "foreign main proceeding" if such foreign proceeding is a "foreign proceeding" pending in a country where the debtor has "the center of its main interests". *See* 11 U.S.C. § 1517(b)(1).

45.     To the best of my knowledge and belief, the UK Proceeding:  (a) constitutes a

"foreign main proceeding" within the meaning of 11 U.S.C. § 1502(f), as the Foreign Debtor maintains its headquarters in Uxbridge, England, which is its center of main interests, and (b) is a judicial proceeding in England under English law relating to insolvency or the adjustment of debt in which the assets and affairs of the Foreign Debtor is subject to control and supervision of the English Court.

46.     For the reasons set forth in the Verified Petition, I submit that recognition of the UK Proceeding is necessary and appropriate for the benefit of the Foreign Debtor, its creditors, and other parties in interest.  Further, I understand that recognition of the UK Proceeding is necessary for the implementation of the Notes Restructuring (to the extent implemented through the Restructuring Plan), as the Notes Trustee has indicated that cancellation of the Unsecured Notes in connection with the Restructuring Plan requires an order of the Bankruptcy Court recognizing the UK Proceeding.

## VII.    Statement Pursuant to Section 1515 of the Bankruptcy Code

47.     I am informed that section 1515 of the Bankruptcy Code provides, in pertinent part, as follows:

    a.    A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.

    b.    A petition for recognition shall be accompanied by—

        (i)    a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

        (ii)    a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

        (iii)    in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

c.      A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

48.      In satisfaction of section 1515(b) of the Bankruptcy Code, attached to the Form Petition as <u>Exhibit B</u> and incorporated herein by reference, is a true and correct copy of the Convening Order evidencing the UK Proceeding and my appointment as the Foreign Representative.[6]  Therefore, the Form Petition meets the requirements of section 1515 of the Bankruptcy Code in satisfaction of the third requirement under section 1517(a) of the Bankruptcy Code.

## VIII.   Disclosure Pursuant to Bankruptcy Rule 1007(a)(4)

49.      I am informed that Bankruptcy Rule 1007(a)(4) provides, as follows:

In addition to the documents required under § 1515 of the Code, a foreign representative filing a petition for recognition under chapter 15 shall file with the petition: (A) a corporate ownership statement containing the information described in Rule 7007.1; and (B) unless the court orders otherwise, a list containing the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and all entities against whom provisional relief is being sought under § 1519 of the Code.

50.      I am further informed that Bankruptcy Rule 7007.1 provides in pertinent part that a corporate ownership statement:

. . . identif[y] any corporation, other than a governmental unit, that directly or indirectly owns 10% or more of any class of the corporation's equity interests, or states that there are no entities to report under this subdivision.

### A.      Corporate Ownership Statement

51.      In compliance with the requirements of Bankruptcy Rule 1007(a)(4)(A), a corporate ownership statement of the Foreign Debtor identifying any corporation (other than a

---

[6]      The Debtor reserves the right to supplement these materials in advance of or at the final hearing on the Verified Petition.

governmental unit) that directly or indirectly owns 10% or more of any class of the Foreign Debtor's equity interests as of the date hereof is attached hereto as **Exhibit B**.

### B.    List of Administrators

52.    In compliance with the requirements of Bankruptcy Rule 1007(a)(4)(B), the Foreign Debtor, its boards of directors, and the Foreign Representative shall maintain control of and be authorized to administer the UK Proceeding.  The service address for the Foreign Debtor in this chapter 15 case is:  Ashton House, 497 Silbury Boulevard, Milton Keynes, United Kingdom, MK9 2LD, Attn: Randy Greben.  I am not aware of any other persons or bodies authorized to administer the UK Proceeding on behalf of the Foreign Debtor.

### C.    Parties to Litigation Pending

53.    The Foreign Debtor is not party to any litigation in the United States at the time of the commencement of this chapter 15 case.

*Remainder of Page Intentionally Left Blank*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my information and belief.

Executed on this October 21, 2025

Name: Randy Greben
Title:   Chief Financial Officer

**<u>Certificate of Service</u>**

I hereby certify that on the 21st of October, 2025, a copy of the foregoing was served by the Clerk of the Court through the ECF system to the parties registered to receive documents via ECF filing.

/s/ Clifford W. Carlson
Clifford W. Carlson