IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 15 |
| FOSSIL (UK) GLOBAL SERVICES LTD,[1] | § § § § | Case No. 25-90525 (___) |
| Debtor in a Foreign Proceeding. | § § § § § | |

## DECLARATION OF GEMMA SAGE IN SUPPORT OF VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE

I, Gemma Sage, hereby declare under penalty of perjury:

1. I submit this declaration (this "**Declaration**") in support of the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "**Verified Petition**")[2] filed contemporaneously herewith by the duly appointed and authorized foreign representative (the "**Foreign Representative**") of Fossil (UK) Global Services Ltd, a company incorporated under the laws of England and Wales (the "**Foreign Debtor**"). I am a solicitor duly admitted to practice in England and Wales, and a partner with the law firm Weil, Gotshal & Manges LLP ("**Weil**"), English legal counsel to the Foreign Debtor.

---

[1] The last four digits of Foreign Debtor's foreign identification number are: 7372. The location of the Foreign Debtor's service address for purposes of this chapter 15 case is: Ashton House, 497 Silbury Boulevard, Milton Keynes, United Kingdom, MK9 2LD. Additional information may be obtained on the website of the Foreign Debtor's information agent at https://dm.epiq11.com/fossiluk.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Verified Petition.

2. As of the date hereof, the Foreign Debtor is the subject of a proceeding (the "**UK Proceeding**") currently pending before the High Court of Justice of England and Wales (the "**English Court**"), concerning a Restructuring Plan (defined below) pursuant to Part 26A of the UK Companies Act 2006 (as modified, amended or re-enacted from time to time, the "**Companies Act**").

3. I am a member in good standing of the Solicitors Regulation Authority and have been with either the Solicitors Regulation Authority or its predecessor, the Law Society, since I qualified as a solicitor at Denton Wilde Sapte LLP on September, 15 2008. I have been a Partner at Weil since January, 1 2019 and have considerable experience in matters related to English insolvency law. My practice has been involved in all aspects of corporate restructuring and insolvency, both contentious and non-contentious. In particular, I have advised investment funds, financial sponsors, financial institutions and corporate borrowers in connection with transactions across the credit spectrum, in particular, cross-border and domestic financial restructurings, special situations investments, credit-led opportunities, event-driven financings and specialized lending transactions.

4. This declaration is comprised of both statements of legal opinion and statements of fact. Where the matters stated in this declaration are statements of legal opinion, such statements represent my view of English law as a practicing lawyer admitted to practice in England and Wales.

5. Where the matters stated in this declaration are statements of fact that are within my personal knowledge, they are true. Where the matters stated in this declaration are statements of fact that are not within my personal knowledge, they are derived from documents

and/or information supplied to me by, or on behalf of, the Foreign Representative and are true to the best of my knowledge, information and belief.

I. **The Foreign Debtor**

6. The Foreign Debtor is a company incorporated under the laws of England and Wales and is an indirect subsidiary of Fossil Group, Inc. ("**FGI**" and, together with its direct and indirect subsidiaries, the "**Company Group**"), a publicly traded company incorporated under the laws of Delaware. The Company Group is a global design, marketing and distribution enterprise that specializes in consumer fashion accessories, particularly watches and jewelry, handbags, small leather goods, belts, and sunglasses.

7. I understand that the Foreign Representative has requested the entry of an order recognizing the Foreign Representative as being a "foreign representative" as defined in section 101(24) of title 11 of the United States Code (the "**Bankruptcy Code**") and as declared pursuant to the Convening Order entered on October 15, 2025 by the English Court, and recognizing the UK Proceeding as a "foreign main proceeding" pursuant to section 1517 of the Bankruptcy Code.

II. **Statements of English Law and Practice**

　A. **English Restructuring Plan**

8. Part 26A of the Companies Act was introduced into the laws of England and Wales by the Corporate Insolvency and Governance Act 2020, which was enacted on June 25, 2020 and the vast majority of its provisions (including the new Part 26A) came into effect on June 26, 2020. A true and correct copy of Part 26A of the Companies Act is attached to this Declaration as **Exhibit A**. Part 26A of the Companies Act allows English companies (and certain foreign companies) to use a statutory tool known as a "restructuring plan" to impose a

compromise or arrangement (including a restructuring of liabilities) agreed with a statutory majority of the relevant company's creditors or members (or any class of creditors or members) upon each and every creditor or member of the relevant class subject to the restructuring plan, provided that certain conditions are met.

9. Unlike a scheme of arrangement under Part 26 of the Companies Act (which the restructuring plan shares many similarities with and was largely based upon), there are two additional "threshold" conditions that must be satisfied in order for a company to be subject to a restructuring plan. The additional conditions are that:

> A. the company has encountered, or is likely to encounter, financial difficulties that are affecting, or will or may affect, its ability to carry on business as a going concern; and
>
> B. (a) a compromise or arrangement is proposed between the company and (i) its creditors, or any class of them, or (ii) its members, or any class of them, and (b) the purpose of the proposed compromise or arrangement is to eliminate, reduce or prevent, or mitigate the effect of, any of those financial difficulties mentioned in condition A above.

10. As with a scheme of arrangement, the restructuring plan can be commenced by a company, any creditor or member of a company, a liquidator of a company being wound up, or an administrator of a company in administration. In this case, the restructuring plan was commenced by the Foreign Debtor. The applicant begins with the preliminary step of circulating a letter (known as a "practice statement letter") to the creditors and/or members of the relevant company who will be subject to the compromise or arrangement contemplated by the proposed restructuring plan. Among other things, the practice statement letter will typically set out the applicant's proposed classes and the applicant's case for why the English Court has jurisdiction in relation to the sanctioning of the restructuring plan. The practice statement letter will notify the recipient creditors and/or members that they have the

4

right to attend the court hearings for the restructuring plan and to raise any concerns they might have regarding the restructuring plan.

11.     The restructuring plan procedure begins when an application is made to the English Court in accordance with Part 26A of the Companies Act requesting a hearing (known as a "convening hearing") for permission to convene meetings of each class of the company's creditors and/or members proposed to be subject to the restructuring plan to enable them to consider and vote on the proposed compromise or arrangement.  Under English law, creditors and/or members of a company will form a class for the purpose of voting on the restructuring plan if those creditors' and/or members' rights against the company, both before and after the compromise or arrangement in the proposed restructuring plan is implemented, are not so dissimilar as to make it impossible for them to consult together in relation to the proposed compromise or arrangement with a view to their common interest (taking into account, among other things, the "relevant alternative," discussed at paragraph 21 below).  The applicant for the restructuring plan will propose the classes of creditors and members to the English Court as part of its application for the convening hearing, but the decision as to whether or not the class constitution is correct is ultimately one for the English Court to determine at the convening hearing.  Creditors and members are given notice of, and entitled to attend, the convening hearing to voice any concerns regarding the proposed restructuring plan, including the composition of the proposed class(es).

12.     The restructuring plan application is supported by witness evidence and a draft explanatory statement, which is the disclosure document for creditors and/or members (described at paragraphs 15 and 28 below in more detail).  At the convening hearing, the English Court will decide whether to grant the applicant permission to convene a meeting or meetings of

the relevant class(es) to consider and vote upon the proposed compromise or arrangement. In making its decision, the English Court will consider (i) jurisdictional issues, (ii) whether the creditors and/or members have been given sufficient notice of the convening hearing, and (iii) the composition of the proposed voting class(es). In determining the jurisdictional issues, the English Court must be satisfied that: (i) the applicant is a company liable to be wound-up under the Insolvency Act 1986, which captures companies registered under the Companies Act in England and Wales, such as the Foreign Debtor, and (ii) the conditions outlined at paragraph 9 above.

13.  In assessing the composition of the proposed voting classes for restructuring plans, the English Court will consider case law and principles that were developed in respect of schemes of arrangements.[3] As explained at paragraph 11 above, the Court will not only consider whether creditors' or members' rights are not so dissimilar that they cannot consult together and should separated into separate classes, but also whether those creditors or members whose rights are sufficiently similar and who can properly consult together should be required to do so to avoid giving a veto to a minority group of those creditors or members. The question of class is a matter of judgement for each particular case, but the English Court has adopted a broad approach to class composition such that the differences between the relevant creditors or members may be material, certainly de minimis, without leading to separate classes being required. This broad approach is relevant to the single class Restructuring Plan that has been proposed by the Foreign Debtor as described further at paragraph 28 below.

14.  The general rule is that every creditor or member whose rights are affected by the proposed restructuring plan must be permitted to participate in a meeting to vote on the

---

[3] *Re Hawk Insurance* [2001] EWCA Civ 241 at [33] per Chadwick LJ, *Re Telewest* [2004] EWHC 924 (Ch) per David Richards J at [37].

restructuring plan. However, the applicant may apply to remove this right in relation to any class of creditors or members, in which case, the English Court must be satisfied that none of the members of that class has a "genuine economic interest" in the company (section 901C(4) Companies Act).  This expression is not defined for the purposes of section 901C(4) of the Companies Act and there is only a brief mention of the expression in the Explanatory Notes[4] (prepared by the UK Government to assist readers of the primary legislation), where the expression is said to refer to an "out of the money" class.  This is not relevant here and the Foreign Debtor has not made any such application under section 901C(4) of the Companies Act in connection with the Restructuring Plan.

15. Once the order convening the meeting(s) is issued, notice of the meeting(s) must be given to all creditors and members who are to be affected by the restructuring plan prior to the meeting(s) in accordance with the order.  Such notice of the meeting(s) must be accompanied by the explanatory statement.  The explanatory statement is a prescribed disclosure document under section 901D of the Companies Act that must contain sufficient information regarding the company and the effects of the proposed compromise or arrangement so as to allow a typical creditor or member to make a reasonable decision regarding whether or not to support the proposed restructuring plan for the purpose of voting at the meeting(s).  From discussions with my partners in the New York office of Weil, I understand that the explanatory statement is comparable to the disclosure statement required under section 1125 of the Bankruptcy Code for solicitation of votes on a Chapter 11 plan.  The creditors and members to whom the restructuring plan is proposed are entitled to attend the meetings in person or by proxy and to ask questions regarding the proposed restructuring plan.

---

[4]  The Explanatory Notes can be found at:
https://www.legislation.gov.uk/ukpga/2020/12/pdfs/ukpgaen_20200012_en.pdf.

16. Each class of restructuring plan creditors and members will consider and vote on the proposed restructuring plan separately. A number representing at least 75% in value of those present and voting in person or by proxy at the relevant meeting must vote in favor of the restructuring plan in order for that class to approve the restructuring plan (this is referred to as the "requisite statutory majority" of each class).

17. The voting majorities are confirmed by a chairperson appointed for the purposes of the restructuring plan meeting(s). To confirm the voting majorities, the chairperson (often with the assistance of a tabulation and calculation agent appointed specifically to assist the company with this task) tabulates the votes of creditors and members submitted. The value of each claim for voting purposes will typically be the face value of the actual and contingent claim of that creditor or member against the company as at a specific date fixed prior to the restructuring plan meetings (referred to as the "record date"). If the requisite statutory majorities of attending and voting creditors and members approve the restructuring plan, the chairperson provides a sworn statement to the court as evidence of the result.

18. Following the meeting(s), the applicant will apply to the English Court to sanction the restructuring plan. The restructuring plan will only become legally binding on the company and on all the creditors or members in the relevant class(es) if sanctioned by the English Court at a second court hearing (referred to as the "sanction hearing"). From discussions with my partners in the New York office of Weil, I understand that the sanction hearing is comparable to a confirmation hearing on a Chapter 11 plan of reorganization under section 1128 of the Bankruptcy Code.

19. At the "sanction hearing", the English Court will consider whether to "sanction" the restructuring plan and make the compromise or arrangement binding on all of the

creditors and members to be subject to the restructuring plan whether or not they voted in favor of it (provided the requisite statutory majority are satisfied for each class or an applicable consenting class if the cross-class cram-down mechanism is to be utilized (as explained at paragraphs 20 and 22 below)).  All creditors and members who are affected by the restructuring plan have an opportunity to raise questions and objections to the restructuring plan and present evidence at the sanction hearing.

20. The English Court may only sanction the restructuring plan if:

A. a number representing at least 75% in value of each class of creditors or members (as the case may be), of those present and voting (in person or by proxy), vote in favor of the restructuring plan at the meeting for that class; or

B. in the event that one or more classes of creditors or members does not approve the restructuring plan in accordance with the voting threshold and process referred to above, the English Court is satisfied that: (i) none of the members of the dissenting class would be any worse off if the restructuring plan were sanctioned than they would be in the event of the "relevant alternative" (as to further explained at paragraph 21 below); and (ii) the compromise or arrangement has been agreed in accordance with the 75% voting threshold referred to above by at least one class of creditors or members who would receive a payment, or have a "genuine economic interest" (as discussed above) in the company, in the event of the "relevant alternative". This is referred to as the "cross-class cram-down mechanism".

21. The "relevant alternative" is whatever the English Court considers would be most likely scenario to occur in relation to the company if the compromise or arrangement were not sanctioned by the English Court.  The applicant will provide evidence to the English Court as to what the relevant alternative is likely to be. Typically, for a company incorporated in England and Wales, the relevant alternative will be an insolvency proceeding such as a liquidation or administration of the company; however, I would note that this is not the case in this matter.

22. As noted at paragraph 20 above, even if there is one or more dissenting classes from the voting at the plan meeting(s), the English Court may still sanction the restructuring plan via the cross-class cram-down mechanism, so long as the other conditions (referred to above at paragraph 20) are satisfied by the applicant. If so, then non-consenting creditors or members can be bound by the terms of the restructuring plan. The cross-class cram-down mechanism, however is not relevant to this case as the Foreign Debtor has proposed, and has received permission to convene a meeting on the basis of, a single class restructuring plan and accordingly, the restructuring plan must only be approved by at least 75% in value of those present and voting (in person or by proxy) in the single class meeting.

23. The English Court may sanction the restructuring plan unconditionally, conditionally upon certain modifications or amendments to it, or may refuse to sanction it. The use of the word "may" in section 901F of the Companies Act in relation to this power to sanction a restructuring plan makes clear that the English Court has discretion regarding whether or not to sanction the restructuring plan, but Part 26A does not specify the factors that the English Court will take into account when deciding whether or not it should exercise that discretion. However, paragraph 190 of the Explanatory Notes to the Corporate Insolvency and Governance Act 2020[5] suggests that the English Court has absolute discretion and will draw on the "well-established principles" that apply in relation to the sanction of schemes of arrangement and restructuring plans.

24. In restructuring plan cases where the utilization of the cross-class cram down mechanism is not proposed, the relevant principles that pertain to the sanction of

---

[5] Available at https://www.legislation.gov.uk/ukpga/2020/12/pdfs/ukpga_20200012_en.pdf.

restructuring plans, as developed and adopted from cases concerning schemes of arrangements, that should be considered by the English Court are summarized as follows:[6]

    A. At the first stage, the English Court must consider whether the provisions of the Companies Act have been complied with. This will include questions of class composition, whether the requisite statutory majorities were obtained at the meeting(s), and whether an adequate explanatory statement was distributed to the applicable creditors or members in the relevant class(es).

    B. At the second stage, the English Court must consider whether each class was fairly represented by persons present and voting at the meeting, and whether the majority were coercing the minority in order to promote interests adverse to the relevant class whom they purported to represent.

    C. At the third stage, the English Court must consider whether the restructuring is a fair restructuring which a creditor could reasonably approve. The English Court is not concerned to decide whether the scheme is the only fair scheme or even the 'best' scheme.

    D. At the fourth stage, the English Court must consider whether there is any 'blot' or defect in the restructuring plan that would, for example, make it unlawful or in any other way inoperable.

25.    Where a large proportion of the company's creditors and/or members are located outside of England and Wales or their claims / debts are not governed by English law, the English Court is also likely to consider, in exercising its discretion, whether there is a reasonable possibility that the restructuring plan will be recognized and given effect in each relevant foreign jurisdiction where the company (and any obligors that will be released from their obligations pursuant to the restructuring plan) has/have material assets or liabilities.

26.    If the English Court sanctions a restructuring plan, the restructuring plan will only take effect once a certified copy of the English Court's order sanctioning the restructuring plan (a "**Sanction Order**") has been delivered to the Registrar of Companies of

---

[6] *Kington SARL v Thames Water Utilities Holdings Limited and others* [2025] EWCA Civ 475 at [100], citing *Re Noble Group (No.2) Ltd* [2019] 2 BCLC 548 at [17], available at https://www.judiciary.uk/judgments/kingston-s-a-r-l-thames-water-and-another-v-thames-water-utilities-holdings-and-others/

England and Wales (or, in the case of an overseas company, published in The Gazette). Upon completion of such aforementioned action, the restructuring plan becomes binding and effective according to its terms on all creditors and members intended to be subject to the restructuring plan, irrespective of notice and their participation or vote at any meeting.

### B. Status of UK Proceeding

27. The Foreign Debtor has proposed a plan under Part 26A of the Companies Act (the "**Restructuring Plan**") in respect of the $150 million 7.00% Senior Notes due 2026 (the "**Notes**") issued by FGI pursuant to that certain indenture, originally dated as of November 8, 2021 and supplemented on each of November 8, 2021 and September 19, 2025, between FGI, as issuer, the Foreign Debtor, as guarantor, and The Bank of New York Mellon Trust Company, N.A., as trustee. On September 23, 2025, the Foreign Debtor issued a practice statement letter (the "**Practice Statement Letter**") to holders of Notes entitled to vote on the Restructuring Plan (the "**Plan Creditors**"). A copy of the Practice Statement Letter is attached to this Declaration as **Exhibit B**.

28. Among other things, the Practice Statement Letter notified the Plan Creditors of the Foreign Debtor's intention to propose the Restructuring Plan, the Foreign Debtor's intention to apply to the English Court for permission to convene a single meeting of the Plan Creditors for the purpose of voting on the Restructuring Plan and the composition of the proposed class of Plan Creditors.

29. Having considered the rights and interests of the Plan Creditors and the appropriate considerations for class composition as summarized at paragraph 16 above, the Foreign Debtor has concluded that the Plan Creditors' rights are sufficiently similar and should

12

be classified together into a single class, with a single meeting held for the purposes of voting on the Restructuring Plan.

30. On October 9, 2025, the Foreign Debtor filed an application with the English Court seeking an order granting the Foreign Debtor permission to convene a single meeting of the Plan Creditors for the purpose of considering, and if thought fit, approving the Restructuring Plan. The application to the English Court by the Foreign Debtor was accompanied by a witness statement from Randy Jon Greben, a director of the Foreign Debtor and the Foreign Representative, which exhibited a draft explanatory statement (the "**Explanatory Statement**"). The Explanatory Statement is attached to this Declaration as **Exhibit C**. The Restructuring Plan is set out at Appendix 6 of the Explanatory Statement.

31. The convening hearing in respect of the Restructuring Plan (the "**Convening Hearing**") was held at 10.30 a.m. (London time) on October 15, 2025. At the Convening Hearing, Mr Justice Cawson considered the proposed Restructuring Plan, including the composition of the creditors entitled to vote on the Restructuring Plan, and by an order dated October 15, 2025 (the "**Convening Order**") granted leave to the Foreign Debtor to convene the requested meeting of Plan Creditors on November 6, 2025 (the "**Plan Meeting**"). A copy of the Convening Order is attached to this Declaration as **Exhibit D**. In accordance with the terms of the Convening Order, a notice of the Plan Meeting (accompanied by the Explanatory Statement) was distributed to Plan Creditors. The Plan Meeting will take place from 2.00 p.m. (London time) on November 6, 2025 in person at the offices of Weil, being 110 Fetter Lane, London, EC4A 1AY, United Kingdom and remotely, via a video conference platform which will operate in the manner described in the draft Notice of the Plan Meeting set out in Appendix 3 of the Explanatory Statement.

32. It is currently anticipated that the sanction hearing in respect of the Restructuring Plan (the "**Sanction Hearing**") will be held on November 10, 2025. If the English Court approves the Restructuring Plan, issues a Sanction Order and the Foreign Debtor delivers a sealed copy of the Sanction Order to the Registrar of Companies of England and Wales, the Restructuring Plan will become effective, and thereby binding as a matter of English law on all Plan Creditors, wherever located.

33. The Restructuring Plan will not be implemented unless and until all conditions precedent to the implementation of the Restructuring Plan have been satisfied.

34. Accordingly, based on discussions with my partners located in the New York office of Weil who are also advising the Foreign Debtor, I understand that the relief requested by the Foreign Representative under Chapter 15 of the Bankruptcy Code is necessary to (i) give effect to the Restructuring Plan in the United States; and (ii) will best assure an economical, expeditious, and fair and efficient administration of the Restructuring Plan that protects the interests of the Foreign Debtor and the Plan Creditors. Based on the foregoing, I believe that the relief requested in the Foreign Debtor's Chapter 15 Case should be granted in full. The Foreign Debtor's "center of main interests," as I understand the term is used in section 1502(4) of the Bankruptcy Code from discussions with my partners located in the New York office of Weil, is located in England and Wales. The Foreign Debtor's registered office is located in England and I understand from the Foreign Debtor that the Foreign Debtor is a tax resident in England and Wales.

35. I believe, to the best of my information and belief, and as identified in the *Declaration of Foreign Representative Pursuant to 11 U.S.C. § 1515 and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure and in Support of Verified Petition for (I) Recognition of*

*Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Under Chapter 15 of the Bankruptcy Code*, filed contemporaneously herewith, the UK Proceeding is the only proceeding related to the adjustment of debts pending for the Foreign Debtor that is both (a) a "foreign proceeding" and (b) pending in the country of the Foreign Debtor's "center of main interests"; therefore, the UK Proceeding is the only proceedings that qualifies for recognition as a foreign main proceeding.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my information and belief.

Executed on this 21st day of October, 2025

/s/  *Gemma Sage*
Name:   Gemma Sage
Title:   Partner

**Certificate of Service**

    I hereby certify that on the 21st of October, 2025, a copy of the foregoing was served by the Clerk of the Court through the ECF system to the parties registered to receive documents via ECF filing.

                                                   */s/ Clifford W. Carlson*
                                                   Clifford W. Carlson